IN the INTEREST OF KEVIN C., A Person Under the Age of 18:

DANIEL R.C., Respondent-Appellant,

v.

WAUKESHA COUNTY, Petitioner-Respondent.

Court of Appeals

*No. 93–1327. Submitted on briefs September 20, 1993.—Decided December 15, 1993.*

(Also reported in 510 N.W.2d 746.)

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Wendy G. Gunderson* of *Mingo & Yankala, S.C.*, of Milwaukee.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Danni L. Caldwell*, assistant corporation counsel.

Before Anderson, P.J., Brown and Nettesheim, JJ.

BROWN, J.  This dispute concerns the determination of a father's payment obligation for residential treatment provided to his son by a county department of social services pursuant to a child in need of protective services (CHIPS) petition. Under the statutes and administrative regulations comprising the Wisconsin Uniform Fee System, a parent providing full financial disclosure to the department is billed for certain county services according to "ability to pay" based on the parent's income. We deem the issue to be whether a circuit court may hear testimony in this type of proceeding, examining whether a parent manipulated income to avoid paying an obligation.

The circuit court in this case did not accept at face value the father's testimony about his income or the tax returns offered as support for his testimony. Rather, the circuit court imputed income to the father based on an inference from the testimony that the father had intentionally manipulated his income downward to avoid paying this obligation. Daniel R.C. appeals, apparently claiming that the circuit court's authority to determine "ability to pay" is limited under the Uniform Fee System to accepting his tax returns and testimony at face value. We reject that and affirm.

Waukesha county provided residential treatment to Daniel's son, Kevin, between May 1988 and October 1990. Initially, Waukesha county determined Daniel's payment obligation for Kevin's treatment by relying on Daniel's self- disclosed yearly income of about $26,000. However, Daniel refused to give any information about the earned income of his wife, Helen, who is not obligated to pay for Kevin's treatment because she is not Kevin's parent. Waukesha county then obtained a summary of Daniel and Helen's 1988 joint income tax

return showing a taxable income of greater than $400,000.

Thereafter, Waukesha county obtained copies of Daniel's 1988 and 1989 tax returns and based Daniel's ability to pay on $96,500, the earned income shown on his 1988 return.[1] Although Daniel's 1989 return showed his earned income as $26,000, Waukesha county eventually calculated Daniel's ability to pay for both years using the $96,500 amount on the "information that the income had been intentionally manipulated by Helen and Daniel."

However, Daniel objected to Waukesha county's calculations and argued that $96,500 was not his true income. He said that, because of an illness he thought to be potentially fatal, he artificially inflated his income on the 1988 return for the purpose of retaining the maximum social security benefits for his children and that $26,000 was his true income. Also, to show that all unearned income should be attributed to Helen, Daniel provided marital property agreements executed between him and Helen since 1985. The agreements provided that Helen and Daniel were "to classify all their property . . . as the individual property of the owning spouse."

Upon motion by Waukesha county, the circuit court held a hearing to show cause why Daniel should not be ordered to pay for the support and maintenance of Kevin. The evidence, including Helen's and Daniel's testimony, was as follows.

When Daniel married Helen in 1981, he owned and managed sixteen different rental properties having a fair market value in 1980 of $872,100; he had a

---

[1] At the $96,500 income level, the unearned income did not factor into the determination of Daniel's ability to pay.

net worth of $742,888. The record does not indicate what happened to these assets.

Daniel also worked in the "mailing business" before his marriage to Helen. However, after his marriage to Helen, according to Daniel, he was employed in mailing businesses started by Helen with inheritance money. Daniel testified that Helen started Mail Wisconsin, Inc., later named Federal Mailing Systems, Inc. She also started Unigeneral Corporation, a management company that ran Federal Mailing. Helen testified that she had no educational background in business or previous business "expertise," but acquired her business knowledge from developing these companies.

Although Daniel held the positions of president and chairman of the board for these companies, he said that these were paper titles only and he was only an employee; his wife was the sole stockholder and operator of the businesses. Daniel described his role as "sales"—"[g]oing out talking to clients getting them to come on board." He also purchased vehicles, signed leases and attended board meetings. He testified that his decisions as president were always made with help from his wife, her attorneys and her accountants. Helen's titles were secretary and executive vice president.[2]

Helen testified that she made the payroll decisions and had decided, with the advice of accountants, to increase Daniel's salary on his 1988 tax return. Although Daniel signed this return, he denied ever reading it. He testified that he never received the

___

[2] Daniel explained that he instead of Helen filled the president position because the president's role involved appearing before large groups such as the United States Postal Service, and Helen did not like to speak in front of groups.

$96,500, claiming that he signed a check and deposited it into his wife's bank account. He denied that his wife manipulated his income, blaming his wife's accountants or advisors instead. He claimed to have little understanding of what was happening or why.

Federal Mailing was sold in 1989. At the time of sale, the corporation had about 650 employees and gross receipts of more than $13,000,000 per year. Daniel, along with other officers of the corporation, signed a noncompetition agreement for which he was paid $5000. Daniel testified that he gave this money to Helen to compensate her for money she had loaned him.

Helen also stated that she paid all of the household expenses, receiving no financial contribution from Daniel. Daniel testified that he was a "kept man." Helen further stated that she personally loaned Daniel money over the years without charging interest or collecting on the loans. In a later hearing, Daniel testified that he borrowed about $62,000 from his wife from about 1986 to 1988, stating that he made some payments on these loans. Helen also testified that she made several loans to Daniel in 1989 and 1990 at the interest rate of 10%, the principal amounts totaling $6840 in 1990 and $65,320 in 1989. One of these loans, in the amount of $20,000, went to Daniel's purchase of a horse for breeding purposes—an apparently unsuccessful business venture.

The circuit court held that Daniel's "ability to pay" should be based on $96,500 for both 1988 and 1989[3] because it found Daniel's testimony incredible. On the basis of Daniel's prior business experience, the circuit

---

[3] Reserving the right to appeal, the parties later stipulated to the amount owed for 1990 based on the court's calculations for 1988 and 1989.

court found Daniel's claims of ignorance about the businesses implausible. Also, in light of Daniel's previous ownership of rental properties and the prenuptial agreement protecting Daniel's properties, the circuit court did not believe Daniel's claim that he was a "kept man." In a later hearing, the circuit court stated that "we know that Daniel . . . brought a significant amount of property with him into the marriage and . . . by 1991 he apparently had no property or assets whatsoever and that his wife, Helen, now had a significant amount of property and assets that were solely hers."

Our review is two-fold. The first issue is whether the Wisconsin Uniform Fee System permits a circuit court to consider evidence relating to imputation of income. This requires construction of the applicable statutes and administrative regulations. Statutory construction presents a question of law which we review *de novo*. *See In re S.E. Trust*, 159 Wis. 2d 709, 713, 465 N.W.2d 231, 233 (Ct. App. 1990).

The second issue is whether the evidence justified imputing income. This presents a review of a circuit court's discretionary decision. *See   id.* at 715, 465 N.W.2d at 234. We will affirm a circuit court's determination of the amount of liability so long as "the court examined the relevant facts, applied a proper standard of law and, using a demonstrated rational process, reached a conclusion a reasonable judge could reach." *Id.* at 716, 465 N.W.2d at 234.

Daniel's overriding argument was that the circuit court improperly based his ability to pay on "earning capacity," rather than on actual earnings, and that this is not a valid basis. Daniel is correct that "earning capacity" is not the proper test in this situation. How-

ever, our review of the record shows that, although the circuit court used the term, "earning capacity," it did not apply that test. Under the "earning capacity" test, the circuit court bases a support or maintenance order on potential income where the obligated person is earning less than he or she is capable. *See, e.g., In re R.L.M.*, 143 Wis. 2d 849, 852-53, 422 N.W.2d 890, 892 (Ct. App. 1988) (basing child support award on earning capacity where father chose to work part-time rather than full-time). Here, the circuit court did not conclude that Daniel was earning less than he was capable. Instead, the circuit court concluded that Daniel's income on his tax return was not a true representation of his actual income.

■

We do not necessarily review a decision based upon the legal term of art used by the circuit court to characterize its reasoning. We review the overall analysis used by the court. We agree with Waukesha county that what the circuit court actually did was to "impute income." Waukesha county borrows this term from Wis. Adm. Code sec. **HSS 80.02**(14) defining "imputed income for child support" as meaning "the amount of income ascribed to assets which are unproductive or to which income has been diverted to avoid paying child support." Here, the circuit court took evidence about whether Daniel diverted income to avoid his support liability for his son's treatment.

■

The Wisconsin Uniform Fee System, established in secs. 46.03(18) and 46.10, Stats., and implemented by Wis. Adm. Code secs. **HSS 1.01-1.06**, regulates the assessment and collection of fees for certain county

services. [4] Waukesha county argues that the Wisconsin Uniform Fee System permitted the circuit court to consider the relevant evidence and to impute Daniel's income to a level higher than what he reported on his tax returns. Although the term "imputed income" is not included in the applicable sections, we construe the Uniform Fee System and interpreting case law to allow imputing income and, consequently, to allow looking beyond tax returns to determine "ability to pay."

First, imputing income comports with the purposes set forth in Wis. Adm. Code sec. **HSS 1.05**(6)(a). Section **HSS 1.05**(6)(a) states that "[a]ll billing and collection efforts shall strive toward what is fair and equitable treatment for both clients who receive service and taxpayers who bear unmet costs." As our supreme court acknowledged in *In re Klisurich*, 98 Wis. 2d 274, 278-79, 296 N.W.2d 742, 744-45 (1980), secs. 46.10 and 46.03(18), Stats., give the department of health and social services the authority to evaluate a person's ability to pay so that the department may recoup the costs of treatment to individuals by state institutions. We acknowledge that the purpose of the Uniform Fee System is also fairness to clients and hold that it is fair and

---

[4] Section 46.03(18)(a), Stats., provides that the "department of health and social services shall establish a uniform system of fees for services provided or purchased by the department of health and social services." Section 46.10(4), Stats., sets forth the procedures enforcing liability: "Upon the failure of any person liable . . . to make payment or enter into or comply with an agreement for payment, the department may bring an action to enforce the liability or may apply to the circuit court of the county in which the . . . liable person resides for an order to compel payment."

equitable to clients to base their "ability to pay" on true income.

Second, nothing in the statutory and regulatory provisions indicates that either the department or the circuit court must accept an individual's financial information at face value. Wisconsin Adm. Code sec. **HSS 1.03**(11) provides that "[a] responsible party who provides full financial information . . . shall be billed on the basis of the family's *ability to pay*."[5] (Emphasis added). Wisconsin Adm. Code sec. **HSS 1.01**(2)(g) defines "full financial information" as "information about a family's income, expenses, assets, and insurance coverage that is necessarily and reasonably requested for the purpose of determining ability-to-pay and for billing all applicable insurance." Wisconsin Adm. Code sec. **HSS 1.01**(2)(h) defines income, in part, as "gross earnings, including money, wages or salary . . . as well as unearned income."[6] These sections do not limit the evidence to tax returns or to the face value of individuals' statements.

Furthermore, we stated in *S.E. Trust* that sec. 46.10(5), Stats., providing for the enforcement of liability under the Wisconsin Uniform Fee System, "gives the circuit court discretion in determining who is liable, the amount of liability and the duration of that liability." *S.E. Trust*, 159 Wis. 2d at 715, 465 N.W.2d at

---

[5] Responsible parties who refuse to supply full financial information shall be liable for full payment of services. Wisconsin Adm. Code sec. **HSS 1.03**(8).

[6] Daniel argues that the circuit court stepped outside of its authority because this section does not define income as including "earning capacity." However, as we stated earlier, we do not interpret the circuit court as using that test.

234. Section 46.10(5)(a) states that the circuit court shall hear the proofs and allegations of the parties to the enforcement action. Section 46.10 does not limit the nature of the parties' allegations, nor does it limit the relevant evidence.

Waukesha county also cites *Lendman v. Lendman*, 157 Wis. 2d 606, 460 N.W.2d 781 (Ct. App. 1990), and *Schinner v. Schinner*, 143 Wis. 2d 81, 420 N.W.2d 381 (Ct. App. 1988), as supporting the circuit court's authority to impute income. Although *Lendman* and *Schinner* do not construe the Wisconsin Uniform Fee System as we are asked to do here, we hold that the policy behind *Lendman* and *Schinner* is commensurate with the policy articulated in *Klisurich*.

In *Lendman*, we considered the exclusion of corporate income from personal income in maintenance determinations; we acknowledged that "automatic exclusion of corporate income from the court's consideration for purposes of determining maintenance would encourage obligors to hide behind a corporate shield to avoid the payment of maintenance." *Lendman*, 157 Wis. 2d at 614, 460 N.W.2d at 784-85.

In *Schinner*, we considered whether bonuses paid to a son working in his father's business should be considered in deciding support and maintenance awards. We stated that the evidence revealed a likely collaboration between a son and his father to camouflage bonus payments as repayments for loans or advances to the son to conceal the son's true income. *Schinner*, 143 Wis. 2d at 104-05, 420 N.W.2d at 390. We called this an "unfortunate situation" calling for the trial court to "utilize its creative talents to monitor and control such deceptive tactics." *Id.* at 105, 420 N.W.2d at 390.

Here, as in *Schinner* and *Lendman*, the heart of the circuit court's decision was finding a party's true income. We construe the Wisconsin Uniform Fee System to allow challenges to an individual's disclosure of financial information where there is evidence that the information is a ruse. To allow individuals to avoid obligation by creative use of a corporate structure and to thereby transfer the costs to taxpayers does not comport with the legislative purpose articulated in *Klisurich. Cf. Lendman*, 157 Wis. 2d at 614, 460 N.W.2d at 784-85. We hold that the circuit court may, as it did in *Lendman* and *Schinner*, look at relevant evidence to determine a party's true income and that authority is commensurate with the policy articulated in *Klisurich.*

Daniel also argues that even if the Wisconsin Uniform Fee System permitted the circuit court's method of calculation, there was no evidentiary basis for the circuit court's conclusion that Daniel's involvement in the family business warranted a salary of $96,500. However, there was testimony that Daniel acted as a company representative, that he was paid not to compete with a business formerly employing him, that he had extensive business experience, that he sought to protect his property interests with marital property agreements, that he artificially inflated his income "to max out on social security benefits," and that he borrowed significant sums of money from Helen without paying her back—all pointing to the conclusion that Daniel played a role in the family businesses commanding an income of at least $96,500 and that he intentionally diverted income. We hold that the circuit court's determination was the product of a rational

mental process by which the facts of record and the law were appropriately considered. *See Lendman,* 157 Wis. 2d at 616, 460 N.W.2d at 785. Furthermore, the circuit court was the arbiter of the weight and credibility of the evidence and we must accept the inference drawn. *See Wallen v. Wallen,* 139 Wis. 2d 217, 224, 407 N.W.2d 293, 296 (Ct. App. 1987). We affirm the circuit court's determination.

In his brief, Daniel contends that Waukesha county's challenge to the validity of the marital property agreements was frivolous and that he is entitled to attorney's fees under sec. 814.025, Stats.[7] Waukesha county had argued alternatively to the circuit court that the marital property agreements executed by Daniel and Helen were invalid and, therefore, half of the unearned income from Helen's property could be considered when determining Daniel's liability.

We think that it is Daniel making a frivolous argument here. Daniel himself put the validity of the marital property agreements at issue when he attempted to use them as proof that all of the unearned income should be attributed to Helen.[8] Whether the agreements are valid goes to the merits of Daniel's

[7] Section 814.025(3)(b), Stats., provides that attorney's fees may be assessed against a party who knew, or should have known, that a claim or defense was "without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law."

[8] For instance, Daniel argued that marital agreements are only enforceable between parties to the agreement and third-party beneficiaries and, therefore, Waukesha county did not have standing to challenge the agreements in this case. *Cf. Lamb v. Manning,* 145 Wis. 2d 619, 626, 427 N.W.2d 437, 440-41 (Ct. App. 1988).

161

claim. Daniel cannot assert the agreements as a shield to liability and expect Waukesha county to accept his assertion without question. Moreover, even if there is a marital property agreement, a court may consider the agreement as a mere tool for manipulating income or assets of the *obligor* to avoid support.

We acknowledge that Helen's income and assets cannot be used to satisfy Daniel's support obligations. However, as the circuit court stated, the agreements do not list any property belonging to Helen. The circuit court stated that "the marital property determination entered into in 1985 said the property should be classified as it existed. It doesn't in any way indicate what property was owned by whom and, therefore, should be attributable to whom." We hold that Waukesha county's challenge to the agreements was defensible and, therefore, not frivolous. *See Sommer v. Carr*, 99 Wis. 2d 789, 797, 299 N.W.2d 856, 859 (1981). We affirm the circuit court's order denying Daniel's motion.

*By the Court.*—Order affirmed.