**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 21, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2018AP2107**

**STATE OF WISCONSIN**

Cir. Ct. No. 2016FA16

**IN COURT OF APPEALS
DISTRICT III**

IN RE THE MARRIAGE OF:

DAWN M. PETIT,

   PETITIONER-APPELLANT,

 V.

TERRANCE A. PETIT,

   RESPONDENT-RESPONDENT.

APPEAL from a judgment of the circuit court for Sawyer County: JOHN M. YACKEL, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Seidl, JJ.

¶1     HRUZ, J. Dawn Petit appeals a divorce judgment dividing the marital estate, establishing monthly child support payments from her former

husband, Terrance Petit, and ordering monthly maintenance to Dawn.[1] Dawn argues the circuit court erred when calculating the amounts of child support and monthly maintenance by using what it found to be Terrance's earning capacity rather than crediting evidence regarding Terrance's income in prior years, before a market downturn in his industry. She also argues the court erroneously exercised its discretion when it determined which items comprised the marital estate and the value of certain items, and when it ordered an unequal division of the marital estate that slightly favored Terrance. We reject these arguments and affirm.

## BACKGROUND

¶2 The parties were married in 2008 and have one minor child. Dawn and Terrance had each been married and divorced before; Dawn had a daughter from her previous marriage and Terrance had two children from his. The divorce petition was filed on March 9, 2016, but the parties had been separated since October 13, 2015, when Dawn moved out of the marital residence.

¶3 The case proceeded to a contested divorce hearing, which was held on June 19, 2017. The parties agreed to be divorced as of the date of the final hearing, but to continue the existing temporary order pending the filing of additional briefs to summarize the parties' respective positions on the contested issues. The contested issues included child support, maintenance and property division.

---

[1] For ease of reading, we refer to the parties by their given names for the remainder of this opinion.

¶4    Dawn testified that she had a high school education and that she had been employed in various administrative and secretarial jobs during her life. Terrance founded and was the sole member of TP Timber, LLC, which was a logging business. Dawn cared for the children and, for a time during the marriage, worked for TP Timber as an office manager. At the time of the final hearing, Dawn was unemployed, apparently due to various medical conditions.

¶5    Terrance testified that his income had substantially decreased starting in February 2016 due to a downturn in the logging industry. As a result, Terrance testified he intended to liquidate his business assets and pursue work as a supervisor or machine operator for one of the larger logging operators.[2] Terrance submitted a financial disclosure form indicating his current monthly income from his employment with TP Timber was $4,000. Given his plans to liquidate, Terrance proposed that his income be set at the annual average earnings for an experienced first-line logging supervisor ($58,150) or for a logging equipment operator ($40,690).

¶6    Dawn challenged this proposal based on the parties' tax returns from 2013 through 2015, asserting that the amount of Terrance's income should be based on TP Timber's adjusted 2015 cash flow. That figure demonstrated the total cash available to the parties and was calculated by adding the corporate taxable income, the wages drawn by the parties, and some depreciation and interest income. Using this calculation, Dawn asserted Terrance's income for purposes of child support and maintenance was $235,455 per year, or $19,621.25 per month. The parties' 2016 tax return had not been completed at the time of the trial in

---

[2] Wage surveys for these jobs were received into evidence.

June 2017.[3] In October 2017, Terrance filed a motion to supplement the record with the 2016 tax returns; Dawn opposed this motion, and the circuit court ultimately denied it.

¶7 The parties also disagreed about the value of key pieces of the parties' personal property. Dawn asserted the net value of the marital estate was approximately $932,026, while Terrance proposed a net value of $460,700. The parties disagreed about the divisibility and value of certain assets identified in a personal property appraisal, the completeness of that appraisal, the value of bank accounts owned by TP Timber, and the value of the parties' real property holdings. Dawn proposed an equal division based upon her valuation of the property, but Terrance, taking into account his valuation, proposed a slight deviation in his favor (52.5% to 47.5%).

¶8 The circuit court held a decision hearing on March 23, 2018. The court rejected Terrance's assertion that Dawn's earning capacity should be set at a paralegal's wage (approximately $55,000), finding that type of work was not immediately available to her due to her medical conditions, but she might eventually be able to achieve such employment. The court set Dawn's earning capacity at the minimum wage, calculated based upon a thirty-two-hour work week.[4] As for Terrance, the court credited his testimony that his once-lucrative business had experienced a downturn that threatened its existence. Accordingly, the court set Terrance's earning capacity at $58,000, that of a first-line logging

---

[3] Terrance testified he typically filed for an extension each year and the business taxes were completed in October.

[4] Dawn's brief had suggested she could reasonably work twenty-five hours per week at the minimum wage.

supervisor in northwestern Wisconsin. The court instructed the parties to calculate child support based upon those earning capacities.[5]

¶9 The circuit court then moved on to property division. It noted the presumption of equal division and the statutory factors to consider when dividing the property, but it observed the parties had not reached an agreement on what should be included in the marital estate. The court specifically found Terrance credible and accepted his testimony regarding certain items that had been gifted to him, and it agreed with Terrance's edits to the personal property appraisal.

¶10 After determining what property was subject to division, the circuit court noted the parties had "substantially more assets than the typical Northwoods divorcing couples but they have immensely more debt." Under either proposal, Terrance would be assuming the parties' $687,453 debt. The court concluded that Terrance's proposal was "an appropriate distribution or division of the property." Under that proposal, Terrance would make a $180,000 equalization payment to Dawn, and she would keep the parties' Lincoln Navigator, which was worth approximately $26,000. The court found the slight deviation from an equal division warranted "because of the fact that he's undertaking a substantial amount of debt and it's still not that far off from a 50/50 division." The court also took into account the tax consequences that would arise in relation to the sale of the business assets.

---

[5] The circuit court subsequently entered an order setting the amount of child support Terrance would pay at $493 per month. Dawn does not challenge this amount as being incorrect, aside from her assertion that the court improperly instructed the parties to use what it found to be Terrance's earning capacity when calculating Terrance's child support obligation.

¶11    Finally, the circuit court addressed maintenance.  After discussing some of the statutory factors, the court concluded it was appropriate that Terrance pay maintenance to Dawn.  However, it rejected her request for $5,000 per month in maintenance for nine years.  The court concluded Dawn's medical issues did not preclude her from all work, and it determined she would need some time to find work and would have additional occupational flexibility as her children aged.  The court ultimately concluded $500 per month in maintenance to Dawn for eighteen months was appropriate.  Noting that Terrance "still has the ability to earn more over the long term," it required the parties to exchange financial information and encouraged them to seek modification of maintenance or child support if needed.

¶12    Dawn filed a motion for reconsideration, asserting that the circuit court erred by basing its child support and maintenance determinations on Terrance's earning capacity rather than his "actual earnings," which she argued was demonstrated by TP Timber's adjusted cash flow in prior years.  It appears Dawn asserted that Terrance's income should have been set at the three-year average business cash flow of $193,686 between 2013 and 2015.[6]  Dawn also challenged the court's adoption of Terrance's proposed property division, alleging the court failed to consider Dawn's proposed property division and did not adequately explain its reasoning.  The motion was apparently heard and denied on

---

[6] This assertion represented a change from Dawn's argument at the final hearing, where she had advocated using TP Timber's adjusted 2015 cash flow of $235,455.

October 4, 2018, after which time the court entered the written judgment of divorce.[7] Dawn now appeals.

## DISCUSSION

¶13 Dawn challenges the circuit court's determination of Terrence's earning capacity with respect to its child support and maintenance awards. She also argues the court erred in determining the value of the parties' marital property and in dividing that property. Child support, maintenance, and property division determinations are all reviewed for an erroneous exercise of discretion. *Weiler v. Boerner*, 2005 WI App 64, ¶¶11, 19, 280 Wis. 2d 519, 695 N.W.2d 833. Likewise, we review a circuit court's decision to impute income for an erroneous exercise of discretion. *See Daniel R.C. v. Waukesha Cty.*, 181 Wis. 2d 146, 155, 510 N.W.2d 746 (Ct. App. 1993). Under that standard, we will affirm as long as the court reached a rational decision based upon the application of the correct legal standards to the facts of the case. *Weiler*, 280 Wis. 2d 519, ¶11.

¶14 Several aspects of the erroneous exercise of discretion standard warrant particular attention in this case. First, we decide any questions of law that may arise during our review independently of the circuit court. *Id.* Second, we will not overturn the circuit court's factual findings unless those findings are clearly erroneous. *Doerr v. Doerr*, 189 Wis. 2d 112, 121, 525 N.W.2d 745 (Ct. App. 1994). Third, because the notion of discretion is "fundamental to the trial

---

[7] There is no order or transcript in the appellate record indicating the circuit court denied the motion for reconsideration, but we accept Dawn's representation (which is undisputed) that the motion was in fact addressed by the court prior to entry of the final judgment in this case. Although Dawn raised some of the same issues in that motion that she raises on appeal, we do not view the transcript of that hearing as essential to dispose of the issues she now raises.

court's ability to fulfill its role in the legal system, 'we will search the record for reasons to sustain its exercise of discretion.'" ***Roy v. St. Lukes Med. Ctr.***, 2007 WI App 218, ¶11, 305 Wis. 2d 658, 741 N.W.2d 256 (citation omitted).

*I. Child Support and Maintenance*

¶15    For both child support and maintenance, the circuit court must determine the parties' available income.  For child support, the court must order "either or both parents to pay an amount reasonable or necessary to fulfill a duty to support a child," WIS. STAT. § 767.511(1)(a) (2017-18),[8] taking into account "all relevant financial information or other information relevant to the parent's earning capacity," § 767.511(1g).  The use of a percentage standard is generally required, § 767.511(1j), which involves first determining the parent's annual income under WIS. ADMIN. CODE § DCF 150.03(1) (June 2019).  That administrative code section explicitly authorizes a circuit court to base the income determination on earning capacity.  *See* § DCF 150.03(3).

¶16    Dawn's argument appears to be that a circuit court can consider a parent's earning capacity when calculating income for child support purposes only if it concludes that the parent is shirking.  Because the court articulated no such explicit conclusion here, Dawn reasons that the use of earning capacity was inappropriate and the court was required to credit the evidence tending to show

---

[8] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

8

Terrance's "actual" earnings.[9]  But, in Dawn's view, the available evidence on this issue is not entitled to equal weight.  Rather, she accuses Terrance of lying about his $4,000 monthly income from his then-current employment with TP Timber, and she asserts the court was instead required to set Terrance's "actual income available for child support" at the three-year average of his annual business earnings from prior years—namely, $193,686.

¶17    As a legal matter, Dawn correctly observes that a court may consider earning capacity for child support purposes only if it has concluded that the parent is "shirking."  *Chen v. Warner*, 2005 WI 55, ¶20, 280 Wis. 2d 344, 695 N.W.2d 758.  However, Dawn omits any meaningful analysis of what it means to find "shirking" by a parent.  As our supreme court explained, a court is "not required to find that a former spouse deliberately reduced earnings to avoid support obligations or to gain some advantage over the other party."  *Id.*  Rather, it need only be found that a party's employment decision to reduce or forgo income is voluntary and unreasonable under the circumstances.  *Id.*

¶18    Dawn is correct that the circuit court did not specifically find "shirking"—at least in her general, undefined sense.[10]  But it did clearly find that

---

[9] It is worth emphasizing that Dawn's argument repeatedly begs the very question of what Terrance's "actual income" was as the time of trial by her presuming his actual income is only discernable from pre-existing documents, such as years-old tax returns and child support orders.  This notion is simply false.  Credited testimony is "evidence," and it is clear Terrance's testimony was that his monthly income at the time of the trial was $4,000 each month, or $48,000 annually, from monthly checks mailed to him by his accountant.

[10] Again, the only reason Dawn attacks the circuit court's findings under the "shirking" analysis is because she believes the court erred by using Terrance's earning capacity as the yardstick for his income.  Typically, a finding that Terrance was shirking would benefit Dawn, as it would increase the amount of income available for child support.  Yet, Dawn proposes that Terrance's "actual" income was much greater than even the $58,000 in earning capacity found by the circuit court.  To achieve her desired result of having Terrance's income set at approximately

(continued)

there had been a downturn in the logging industry as of June 2017 that imperiled Terrance's business. Indeed, this fact was generally undisputed at trial. Terrance's equipment appraiser, Russ Hinsa, who had thirty-two years' experience in the logging equipment business, testified that "right now everyone is struggling" with respect to slow paper and lumber markets. A wave of consolidation had occurred; in Hinsa's words, "[t]he small loggers are pretty much being forced to work for larger loggers." Even Dawn's certified public accountant testified that the logging market was depressed and wood prices were not doing well. The issues for the court became whether to use Terrance's earning capacity—thus requiring it to find shirking—and, if so, how best to determine that capacity.

¶19 Under these circumstances, the record adequately supports the circuit court's implicit finding of "shirking" in the sense that Terrance's continued employment with his business was both voluntary and unreasonable as compared to his instead promptly liquidating the business's assets and earning more income by taking employment with a larger logging enterprise. *See Town of Avon v. Oliver*, 2002 WI App 97, ¶23, 253 Wis. 2d 647, 644 N.W.2d 260 ("[W]e assume the court implicitly made those findings necessary to support its decision, and we accept those implicit findings if they are supported by the record."). Although Dawn does not address either of the "shirking" criteria, it cannot be reasonably disputed that Terrance's continued involvement with his business was voluntary. The reasonableness of that employment, while a question of law, is reviewed using a "more heightened appellate scrutiny than the highly deferential erroneous

---

$193,000, she must show *both* that the court erred by considering Terrance's earning capacity *and* that his asserted actual monthly income of $4,000 was incredible as a matter of law.

exercise of discretion standard of review," because it is intertwined with factual determinations. **Chen**, 280 Wis. 2d 344, ¶42.

¶20    Here, the circuit court clearly found that Terrance could be earning more than the $4,000 per month that he testified he was making by immediately shuttering the business and taking employment with a larger logging enterprise. That course of action would have increased his annual income by approximately $10,000, from $48,000 to $58,000. There was no evidence presented that the logging market was likely to recover soon.[11] Because the facts support the court's implicit findings of voluntariness and unreasonableness in terms of Terrance's failure to take employment with a larger logging enterprise, it was not error for the court to use Terrance's earning capacity upon the liquidation of his business rather than his testified-to earnings as of the June 2017 trial.

¶21    Alternatively, even if there was error in the circuit court's use of Terrance's earning capacity, it does not follow that the court was required to accept the evidence Dawn now champions as establishing Terrance's "actual" income. The evidence she relies on was, by the time of the June 2017 hearing, years old in most cases. The business tax returns were from 2013, 2014 and 2015; Dawn ignores the undisputed testimony that the logging industry had experienced a downturn since that time. Moreover, Dawn strangely criticizes the court for not relying on Terrance's "actual income" while simultaneously arguing the court

---

[11] The only evidence that might have supported a contrary finding about TP Timber's future prospects was Hinsa's testimony that "it [the market] can change, hopefully it will change by this winter but right now everyone is struggling." This statement was speculative and did not indicate that Hinsa anticipated such a change. Nonetheless, we observe that if indeed market forces changed Terrance's fortunes vis-à-vis his business, the parties' exchanges of financial information would reveal that, and Dawn could then seek to modify child support.

should have assigned an "average" income figure that was never shown to be reflective of his actual income in 2017. Dawn's accountant acknowledged he did not know what Terrance's 2016 income would look like. Dawn also relies on a child support order entered in Terrance's prior divorce action showing that Terrance was capable of earning approximately $13,813 monthly. That order was entered in 2013—nearly four years before the July 2017 evidentiary hearing in this action.

¶22 For the same reasons, we reject Dawn's challenge to the circuit court's determination of Terrance's earning capacity for maintenance purposes. The "starting point is the general rule that a court should consider the parties' financial circumstances as they exist at the time the court makes or modifies a maintenance award." *Woodward v. Woodward*, 2005 WI App 65, ¶6, 281 Wis. 2d 217, 696 N.W.2d 221. Again, Dawn suggests the court was required to establish an income for Terrance of $193,686, which was the three-year average cash flow for TP Timber between 2013 and 2015. For the reasons already stated, the court did not erroneously exercise its discretion when it set Terrance's earning capacity as of June 2017 at the wage for a first-line logging supervisor in northwestern Wisconsin.

¶23 Dawn also argues the circuit court erred by failing to consider the purposes for maintenance and all of the statutory factors to consider when setting maintenance. When determining whether maintenance is appropriate, a court can look at a variety of circumstances set forth by statute, including the length of the marriage, the parties' ages and health, the parties' earning capacities, and the tax consequences to each party. *See* WIS. STAT. § 767.56(1c)(a)-(j). These factors are designed to further the two distinct goals of maintenance: support and fairness. *Rohde-Giovanni v. Baumgart*, 2004 WI 27, ¶29, 269 Wis. 2d 598, 676 N.W.2d

452. The court need not consider all of the statutory factors, but it must consider those that are relevant. ***DeLaMatter v. DeLaMatter***, 151 Wis. 2d 576, 586, 445 N.W.2d 676 (Ct. App. 1989).

¶24 Dawn accuses the circuit court of ignoring her significant living expenses reflected on her financial disclosure statement. Dawn apparently believes the court was required to order maintenance at a level that would cover all of her expenses. However, Dawn cites no authority for such a proposition; at most, the feasibility that the party seeking maintenance can become self-supporting at the standard of living enjoyed during the marriage is but one factor among many in addressing the maintenance issue. Additionally, her argument ignores that Terrance's financial disclosure form also showed monthly expenses that outpaced his claimed income.[12]

## II. *Property Division*

¶25 The first task when dividing a marital estate is to determine what property is subject to division. "The general rule is that assets and debts acquired by either party before or during the marriage are divisible upon divorce." ***Derr v. Derr***, 2005 WI App 63, ¶10, 280 Wis. 2d 681, 696 N.W.2d 170; *see also* WIS. STAT. § 767.61(2)(a). When a party to a divorce asserts that property is not subject to division, that party has the burden of showing the property is

---

[12] Dawn also cites the circuit court's property division in asserting the amount of maintenance was erroneous. Although maintenance and property division are somewhat intertwined, *see **Bahr v. Bahr***, 107 Wis. 2d 72, 80, 318 N.W.2d 391 (1982), Dawn's argument on this point is undeveloped, and we will not consider it, *see **State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). Dawn does not explain why the property division required the court to order an increased amount of maintenance.

nondivisible at the time of divorce, *Derr*, 280 Wis. 2d 681, ¶11, such as by showing that the property was an inheritance or was a gift, *see* § 767.61(2)(a).

¶26    Dawn notes that the parties significantly disagreed about the total value of the marital estate.  She accuses the circuit court of ignoring her "physical evidence or expert appraisals," and of providing an insufficient explanation for why it adopted Terrance's proposed division and valuation.  She specifically focuses on four aspects of the division with which she disagrees:  (1) the value of, and divisibility of, certain items of the parties' personal property; (2) the value of the parties' real property; (3) the value of certain items Dawn claims are "missing" from the marital estate; and (4) the value of the business bank accounts.  She also challenges the court's unequal division of the marital estate.

### A.  Personal Property

¶27    At trial, Dawn presented an appraisal by Robert Paffel of the parties' personal property.[13]   Terrance generally agreed with the appraisal, but he made line edits to the appraisal form where he contended the property was either not owned by the parties, was not divisible, or had a value different than that which Paffel had assigned.  In general, Terrance asserted various firearms in the basement of the marital residence had been gifted to him, essentially reducing the value of the basement items by half of Paffel's assigned value of $7,530.  Terrance also disagreed about the value of certain vehicles in the garage, asserting they were worth $18,545 less than the $107,205 value Paffel had assigned.

---

[13]  Although Terrance criticizes Dawn for not calling Paffel to testify, it was stipulated at trial that appraisals could be received into evidence without having to call the appraisers that prepared them.

¶28    Dawn argues the circuit court erroneously relied on Terrance's opinion of the value and divisible nature of these items. In essence, she claims the court had no choice but to divide all the assets Paffel identified at the values he assigned to them. This is not the law. A non-expert owner of property may generally testify concerning the value of his or her personal property. **Trible v. Tower Ins. Co.**, 43 Wis. 2d 172, 187, 168 N.W.2d 148 (1969). The owner is certainly competent to testify whether a specific item was a gift and is therefore nondivisible. *See* **Derr**, 280 Wis. 2d 681, ¶10. The weight to be given that testimony is for the trier of fact, and its findings will not be reversed unless they are clearly erroneous. **Liddle v. Liddle**, 140 Wis. 2d 132, 136, 410 N.W.2d 196 (Ct. App. 1987). Dawn's mere disagreement with the court's factual findings does not render them clearly erroneous.

### B. Real Property

¶29    At trial, Dawn also presented appraisals of the parties' various real estate holdings. The parties owned the marital residence and four vacant properties, and although Terrance valued the vacant land slightly differently than the appraisal, Dawn only challenges the parties' disagreement regarding the marital residence on appeal. Dawn asserts the marital residence should be valued at $195,000, which is the value indicated on the appraisal for that property. In accepting Terrance's valuation, the circuit court determined the property was worth $169,400.

¶30    Again, the circuit court, sitting as trier of fact, did not erroneously resolve the parties' dispute regarding the value of the marital residence. The appraisal acknowledged a problem with the home's foundation. Terrance testified that the basement wall was caving in, the garage floor was broken, and the frost

wall in the garage was heaved. Terrance testified he did not know whether the appraisal's final value determination took into account the needed foundation repairs, which the appraisal estimated would cost $25,600.[14]   Although Dawn challenges the value ultimately assigned by the court, nowhere does she indicate that in valuing the property the appraisal did, in fact, take into consideration the $25,600 in needed work.  In short, Dawn has not demonstrated that the court's valuation of the martial residence was clearly erroneous.

### C. "Missing" Items

¶31     When Dawn introduced the Paffel appraisal, she testified there were certain items Paffel could not locate that should have been included in the marital estate, including an off-road vehicle, a bulldozer, jewelry, some firearms, a work truck, and a toolbox.  Dawn testified that December 2015 was the last time she saw the firearms and the toolbox and that the jewelry was a gift from Terrance's mother to the children.  Terrance admitted to owning the off-road vehicle but denied owning other items; he specifically testified that the bulldozer, a firearm, and a toolbox had been either sold to pay bills or traded for services.  Dawn did not submit any evidence tending to show the "missing" items actually existed, nor did Terrance submit any evidence supporting the notion that the items he acknowledged owning in the past had actually been sold or traded.

¶32     Given that the matter was purely one of competing testimony, we must accept the circuit court's credibility finding.  The court specifically found that as to matters involving the property division, Terrance was more credible than

---

[14]  Again, the appraiser did not testify at trial, by stipulation of the parties.  *See supra* ¶27 n.13.

Dawn. When a circuit court's conclusions are based on the court's credibility findings, we generally accept those determinations. *State v. Quarzenski*, 2007 WI App 212, ¶23, 305 Wis. 2d 525, 739 N.W.2d 844. Such deference is appropriate because the court has the opportunity to observe the witness's demeanor and gauge the persuasiveness of his or her testimony. *Jacobson v. American Tool Cos.*, 222 Wis. 2d 384, 390, 588 N.W.2d 67 (Ct. App. 1998).

### D. Bank Accounts

¶33 Dawn also argues it was an "abuse of discretion" for the circuit court to accept Terrance's representations as to the value of the business bank accounts.[15] Terrance testified he had three bank accounts: (1) a personal checking account worth $619; (2) a TP Timber business checking account worth $130,446; and (3) a business savings account worth $2,817. Dawn argues the court could not have accepted this testimony because Terrance provided "zero evidence of proof of the balance of those accounts."

¶34 In contrast, Dawn presented two bank statements dated October 2015, contending they more accurately represented the value of the business accounts. Those statements showed the value of two accounts, one worth approximately $301,872 and one worth approximately $127,332. Dawn argues the court should have "use[d] the values of accounts provided by those exhibits since those bank statements provide the greater weight of credible evidence to the

---

[15] Our supreme court substituted the phrase "abuse of discretion" with the phrase "erroneous exercise of discretion" decades ago. *See King v. King*, 224 Wis. 2d 235, 248 n.9, 590 N.W.2d 480 (1999).

value of those accounts rather than [Terrance's] testimony, and [are] supported by the expert witness testimony [as] to the cash available."

¶35    Dawn ignores the fact that, by the time of the June 2017 trial, the bank statements she introduced were over one and one-half years old.  It is undisputed that Terrance continued operating the logging business during this time.  Because Dawn's financial information was stale, the circuit court could reasonably accept Terrance's testimony as to the current value of those deposit accounts.  Moreover, Dawn acknowledged at trial that Terrance had given her authorization to get account information directly from the bank.  Dawn testified she had not used that authority to review any transactions from the various accounts since the October 2015 statements were generated.

¶36    Dawn posits that because Terrance did not specifically explain what money he had withdrawn from the accounts between October 2015 and the time of trial, he must have committed misconduct by disposing of or hiding assets.  Under WIS. STAT. § 767.63, there is a rebuttable presumption that assets transferred for inadequate consideration, wasted, given away, or otherwise unaccounted for by one of the parties within one year of the filing of the divorce petition are subject to division.  It appears the party asserting assets were "wasted" bears the burden of proof on that issue.  *See Derr*, 280 Wis. 2d 681, ¶66.

¶37    Here, Dawn did not present any evidence tending to show "waste" or an inexplicable diminution in marital assets.  Again, it is undisputed that Terrance continued operating his logging business during a downturn in the industry.  Moreover, he testified in detail about his monthly expenses, which he calculated to be approximately $23,000 after accounting for personal expenses and debt service to business and vehicle lenders.  When asked how he was making those payments

on a $4,000 monthly income, Terrance testified the difference was coming from the business bank accounts. This testimony both explained the diminished bank accounts and further supports Terrance's statement of his income, such that the circuit court did not clearly err by setting the value of the bank accounts in line with Terrance's testimony.

### E. Unequal Division

¶38    More broadly, Dawn asserts the circuit court failed to sufficiently explain its decision to deviate from the presumption of an equal division of property. Her argument on this point is cursory; she argues the court cited only one factor in deciding upon an unequal division, which was the tax consequences to the parties. She also claims there was not sufficient evidence of any tax consequences stemming from the division to warrant consideration of that factor.

¶39    Besides Dawn's argument being largely undeveloped, it also fails on the merits. There is a presumption of equal division, but a circuit court may alter that presumption after considering a litany of factors, as applicable. *See* WIS. STAT. § 767.61(3). Here, the court specifically took note of these factors when it began its analysis of the property division, focusing specifically on the length of the marriage and the property brought to the marriage by each party. *See* § 767.61(3)(a), (3)(b).

¶40    During its analysis, the circuit court observed that Terrance had brought his business and the marital residence into the marriage, while Dawn had brought into the marriage a car and about $17,000. Terrance started TP Timber in 2004 and brought vehicles and business equipment into the marriage. He built the marital residence in 2002 while he was married to his first wife. The court also

noted that Terrance and Dawn's marriage was a "medium" term of about nine years.

¶41 There was also evidence from which the circuit court could reasonably conclude that, although Terrance was receiving a slightly more favorable division on paper, he would not fully realize the amount allocated to him. Dawn's accountant testified at trial that Terrance had taken a full deduction on some equipment in the year it was purchased, rather than depreciating it annually. As a result, Terrance asserted he would be required to recapture a certain amount of depreciation upon the sale of the equipment, further reducing the amount Terrance would receive. This proposition went unchallenged by Dawn; indeed, she conceded it was "probably true."[16]

¶42 In all, we conclude the circuit court did not erroneously exercise its discretion by ordering an unequal division of the marital property. The deviation was minimal (again, Terrance received 52.5% of the net estate, while Dawn received 47.5%), and it was adequately explained by the court, as shown above. The court acknowledged the appropriate law, including the presumption of equal division; considered those factors it deemed to be relevant when ordering an unequal division; and reached a reasonable conclusion.

> *By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.

---

[16] We take no position on whether the circumstances here would, in fact, require Terrance to abide by recapture rules as a result of the sale of his business equipment, as that issue has not been briefed by the parties.